Posey W. Myers v. Commissioner. Clyde W. Myers v. Commissioner.
Posey v. Commissioner
Docket Nos. 35320-35322.
United States Tax Court
1953 Tax Ct. Memo LEXIS 130; 12 T.C.M. (CCH) 1023; T.C.M. (RIA) 53302; August 31, 1953
*130 Held, the petitioners' failure to file income tax returns for the years 1939 and 1940 and their failure to report their correct income for the years 1941 through 1947 were proven to be due to fraud with intent to evade tax. Claude C. Pierce, Esq., for the petitioners. William R. Bagby, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies in income and victory taxes and additions to the tax against the petitioners: Docket
50 Per Cent
25 Per Cent
Petitioner
No.
Year
Deficiency
Penalty
Penalty
Posey W. Myers
35320
1941
$ 8,895.94
$ 4,447.97
1942
5,582.67
2,791.34
Clyde W. Myers
35321
1941
8,895.94
4,447.97
1942
5,582.67
2,791.34
Clyde W. Myers
35322
1939
1,761.94
880.97
$440.49
1940
110.83
55.42
27.71
1943
267.86
133.93
1944
11,421.91
5,710.96
1945
11,261.83
5,630.91
1946
29,730.03
14,865.02
1947
1,141.45
570.73
The issues to be determined in these proceedings are whether the petitioners failed to report their correct income during the years in question and whether *131 such failure was due to fraud with intent to evade tax. In the event of a determination of absence of fraud, a question with respect to the statute of limitations is raised. Findings of Fact The facts stipulated are found accordingly. The petitioners, Clyde W. Myers (hereinafter sometimes referred to as Myers), and Posey W. Myers (hereinafter sometimes referred to as Posey), are husband and wife and filed joint returns with the collector of internal revenue for the district of North Carolina for the years 1941 and 1942. They filed separate returns for the years 1943 to 1947, inclusive. They never filed a federal income tax return prior to their 1941 joint return. During the calendar years 1939 to 1947, inclusive, Myers was primarily occupied as a used car dealer in Winston-Salem, North Carolina, and Posey was a housewife. Myers also invested his income and did some trading in real estate. Myers is a man of limited education, having left school in the third grade. After leaving school, Myers engaged in the business of buying and selling fruit and vegetables until he was about 19 years of age. At that time he began trading horses and mules and selling farm produce on his own *132 account. He has always done business on a strictly cash basis. From 1929 to 1932, Myers owned one or two trucks with which he hauled farm produce to the markets for sale. He purchased some of his fruits and vegetables in South Carolina and Florida and brought them to North Carolina for sale. In 1932, Myers lost money hauling strawberries but was able to retain his two trucks despite his financial misfortune. Until 1934, Myers engaged in trading horses and cattle at which time he bought a new truck and reentered the produce business. It was at this time that he first began to make money from his business operations. About 1936 Myers entered into an arrangement with a Winston-Salem garage operator, Alex Jones, whereby Jones furnished a car dealer's license and place of business and Myers, who paid part of the rent, bought cars with his own money and put them in Jones' garage to be sold. Profits on sales were divided equally between Jones and Myers. This arrangement lasted about a year and a half and was not particularly profitable. Sometime in 1938, Myers went into business for himself and moved from Jones' garage. During this period, Myers had no bank account but carried cash in his *133 pocket. He also engaged other individuals to buy and sell used cars, Myers furnishing the money and the other individual engaging in the actual buying and selling. Profits in these ventures were shared equally. In 1938, Myers sold horses and mules from a barn in Winston-Salem in partnership with one Newsome and he also sold cords of wood during this period. During the years in which he was engaged in the used car business, Myers dealt largely in cash except for the use of some cashiers' checks. When he opened a bank account, Myers did not write the checks on this account himself but had someone else write them for him and he signed them. Myers purchased used cars in various locations throughout the south and took them to Washington, Philadelphia, Baltimore, New York and other cities where he sold them or traded them for smaller cars which he brought back to North Carolina. He employed other men to buy and sell used cars and furnished them the necessary currency to carry on the business. When funds were needed by his associates in distant cities, Myers wired the necessary amount in cash at times when the banks were not open. In 1939, the Myers family lived in an apartment in Winston-Salem *134 and shortly thereafter moved to a house near Winston-Salem. In August 1943, the family moved to one of the better residential sections of Winston-Salem. Myers' business policy was to buy and sell or trade his used cars rapidly and in his words he "would trade anything." He was usually able to make a profit out of the sale or trade of an automobile or other asset which he owned. Myers' principal policy in trading used cars was to fix up the automobiles so that they looked well but he had little, if any, mechanical work performed on them. He invested his profits from his trades and sales in bonds and real estate during the period involved. He had a preference for business investments where he could continue to control his money. Myers found by experience that he could purchase cars and trucks for cash at a lower price than was possible by the use of checks since he was often a stranger to the people with whom he was dealing. In carrying on his used car business, he dealt with and handled bills of sale and automobile titles, as well as mortgages and liens on the cars. In the later years before us, Myers bought and sold real estate, loaned money and took mortgages on properties, the *135 sales price of which was to be paid over a period of time. He operated farms, sold tobacco, and, in 1937, sold lumber and cord wood. He rented real estate and operated a produce store and in 1947 constructed six houses and one three-room garage apartment at a cost of $51,491.91. The assets and liabilities of the petitioners, as agreed to by the parties, with exceptions of cash on hand, inventory, and living expenses, are as follows: [See table beginning on next page.] 1/1/39
12/31/39
12/31/40
12/31/41
12/31/42
Assets
Cash on hand
Cash in banks
First National (CWM)
$ 1,232.42
$ 6,570.71
$ 114.19
$ 9.799.34
$21,473.85
Wachovia (PWM)
Wachovia (CWM)
Bldg & Loan Stock
Standard
Winston-Salem
400.00
400.00
Government Bonds
3,843.75
Deeds of Trust
Charles Bolick
R. G. Lucas
R. D. Fowler
P. Welboan
R. O. Kirkman
G. Short
G. McCrary
Geo. Frye
Albert Wall
H. Ammons
Frank Barlow
E. L. Owens
Notes Receivable
Inventory
Cars
10,000.00
5,000.00
Wood on Yard
Lumber (Rutledge Farm)
Furniture & Fixtures
Personal Auto
Real estate (schedule)
9,292.50
23,945.00
36,895.00
31,997.30
33,197.30
Liabilities
Real Estate Mortgages
Std. Bldg. & Loan
$4,400.00
$4,400.00
$7,966.14
$4,500.00
First Fed. Bldg. & Loan
Winston-Salem
Bldg. & Loan
E. T. Nance
D. Clinard
Robah Thomas
A. V. Nash
Reserve for Depreciation
181.06
858.18
2,107.80
2,362.42
$3,364.54
Expenditures
Federal tax paid
251.29
Non-taxable Income
50% Long term gains
125.00
687.50
150.00
*136 12/31/43
12/31/44
12/31/45
12/31/46
12/31/47
Assets
Cash on hand
Cash in banks
First National(CWM)
$ 4,789.30 2,100.15
$ 9,424.35
Wachovia (PWM)
2,346.91
385.88
964.00
$ 2,060.53
$ 1,302.79
Wachovia (CWM)
17,980.87
6,261.12
Bldg & Loan Stock
Standard
600.00
600.00
600.00
800.00
800.00
Winston-Salem
400.00
400.00
400.00
400.00
400.00
Government Bods
4,875.00
7,937.50
10,725.00
10,725.00
10,725.00
Deeds of Trust
Charles Bolick
13,000.00
$. G. Lucas
2,670.00
R. D. Fowler
2,601.67
1,300.83
P. Welboan
4,500.00
R. O. Kirkman
350.01
350.01
G. Short
7,000.00
G. McCrary
600.00
Geo. Faye
5,500.00
4,950.00
4,400.00
3,850.00
Albert Wall
600.00
H. Ammons
2,950.00
Frank Barlow
300.00
E. L. Owens
7,300.00
Notes Receivable
11,895.32
Inventory
Cars
1,879.00
12,404.34
36,980.09
33,136.32
Wood on Yard
6,921.26
2,901.00
Lumber (Rutledge Farm)
13,041.57
Furniture & Fixtures
1,656.10
1,656.10
Personal Auto
3,000.00
Real estate (schedule
72,472.50
81,425.00
101,044.52
111,869.32
164,250.08
Liabilities
Real Estate Mortgages
Std. Bldg. & Loan
First Fed. Bldg. & Loan
$18,269.39
Winston-Salem
Bldg. & Loan
$7,000.00
E. T. Nance
9,366.52
D. Clinard
$5,000.00
5,000.00
robah Thomas
$12,000.00
A. V. Nash
7,500.00
Reserve for Depreciation
3,607.91
$3,497.53
3,796.66
3,693.88
5,209.77
Expenditures
Federal tax paid
3,757.04
3,735.40
1,691.10
6,039.61
11,076.96
Non-taxable Income
50% Long term gains
1,326.35
3,357.50
2,530.63
3,551.76
1,489.90
*137 Myers states his cash on hand as of January 31, 1939 at $38,000; $34,675.53 as of December 31, 1939; $34,025.33 as of December 31, 1940; $32,751.68 as of December 31, 1941; $30,042.60 as of December 31, 1942; $26,049.34 as of December 31, 1943; $18,967.39 as of December 31, 1944; and $13,809.74 as of December 31, 1945. He states that there was no cash on hand as of December 31 of the following two years. The respondent states the petitioner's cash on hand as $10,000 as of December 31, 1941; $13,000 as of December 31, 1942 and $13,000 as of December 31, 1947. The petitioners fixed their living expenses during the period in question at $2,000 for the year ended December 31, 1939; $3,000 for each 1940, 1941 and 1942; $3,940.62 for 1943; $4,879.09 for 1944; $5,800 for 1945; $6,899.10 for 1946; and $7,000 for 1947. The respondent fixed the petitioners' living expenses for the petitioners and their family at $2,000 for 1939, $3,000 for 1940, $4,000 for 1941, $5,000 for 1942, and $7,000 for the years 1943 to 1947, inclusive. During the years in question, the petitioners obtained a substantial portion of their food from farms owned by their parents. They were not extravagant in buying *138 clothes nor did they belong to social clubs or other societies. Myers and Posey used for their personal use cars which Myers had in his inventory at the time. The respondent's agent determined living expenses from canceled checks covering expenditures for various purposes. Myers gave Posey an allowance in order to run the family household. The amount of this allowance was $15 per week in 1939, $25 per week in 1940, 1941, 1942 and until August of 1943 when it was raised to $50 per week. This household allowance was $50 per week in 1944, 1945 and 1946 and was increased to $75 per week in 1947. Myers held a life insurance policy on each of his children taken out soon after birth. During the years 1944 to 1947, inclusive, Myers was covered on his own life with a $10,000 policy and during the years 1939 to 1947, inclusive, Posey had a $500 life insurance policy. During the years 1943 to 1947, inclusive, Myers maintained ponies at his home for the use of his children. During 1942, Myers spent $400 for furniture for his home, another $400 for a heating plant and $2,000 for furniture in 1943. During the years 1941 to 1942, inclusive, the petitioners claimed two dependents; in 1943, Myers claimed *139 four dependents; in 1944, Myers claimed two dependents; in 1945 Myers claimed three dependents; in 1946, four dependents; and in 1948, eight dependents. During the years involved, three children were born to the petitioners and two others died. During years 1938 to 1946, inclusive, Myers carried on his banking business with the First National Bank of Winston-Salem, North Carolina. During the years 1938 to 1946, inclusive, this bank issued a number of certified checks payable to Myers, the majority of which were purchased by Myers with cash. Myers carried these certified checks with him for use in place of cash. The bank also issued certified checks to Myers during these years pursuant to a system to pay Myers for the collection of ordinary checks payable to Myers issued by his customers on other banks. Myers presented the customer's check to the bank for collection, the bank gave him a receipt and then, when the customer's check was paid, the bank issued Myers a certified check for the proceeds, less charges. The total face amount of the certified checks issued to Myers during the years 1938 to 1947, inclusive, and the total face amount of such checks outstanding at December 31 during *140 the years 1938 to 1947, inclusive, are as follows: Total Face Amount
Total Face
Outstanding
Amount Issued
Year
at Dec. 31
during Year
1938
$ 390.00
1939
8,825.00
1940
$3,350.00
17,674.12
1941
3,350.00
4,425.00
1942
284,570.05
1943
81,903.09
1944
7,445.42
89,909.22
1945
1,750.00
37,067.95
1946
33,324.05
1947
During 1944, Myers secured three loans from this bank which were paid off as follows: a note on April 18, 1944 for $6,000, endorsed by Posey, was paid on May 16, 1944; a note on May 22, 1944 for $15,000, endorsed by Posey, was paid on June 21, 1944; a note on October 11, 1944 for $12,000, upon which both Myers and Posey were makers, was paid off within the time allotted of 15 days. In 1942 Myers employed a real estate agency to manage his rental properties. This agency also handled some of Myers' real estate sales and handled notes payable and deeds of trust executed by the purchasers of real estate from Myers. The agency furnished a record of monthly income showing expenditures and commissions and issued its check for the net amount of the collection. Sometime later, pursuant to a request from Myers, two accounts *141 were maintained, one for Myers and one for Posey. Rental checks were then made payable and sent to Posey for certain real estate during the years 1943 to 1947, inclusive, and she reported this income in her returns. The proceeds from the sale of real estate, the rent from which the agency paid to Posey during these years, were paid by the agency to Myers and these proceeds included profits which were reported by Posey in her returns for the years 1943 to 1947, inclusive. Posey reported a total of $10,495.80 as profits from real estate sales but this sum was received by Myers. During the years 1943 to 1947, 81 sales of real estate were reported by Myers. A profit of $49,331.90 was made on 73 of these sales and $725 was lost on two. In 1941, Myers sold a farm at a profit of $900, which was not reported in the petitioners' 1941 joint return. Myers' rental agent advised him in 1941 that he was probably required to file income tax returns. Myers engaged an attorney in Winston-Salem who prepared the petitioners' return for 1941. In 1942, the petitioners obtained assistance from an accountant in the preparation of their tax return. In preparing this return, the accountant relied entirely *142 upon the petitioners' cash receipts and disbursements as evidenced by bank deposits and checks. The same accounting method was followed in determining the petitioners' income for the year 1943. In 1944, Myers kept a used car record to reflect his transactions and the accountant, in the preparation of his 1944 return, took into account the sales figures so kept and deducted therefrom the cost of acquisition and reconditioning automobiles as well as specific expenses that could be identified. The same method was followed by the accountant in preparing the tax returns for the years 1945 and 1946. In 1947, this method was changed and the return was prepared from bank statements and checks. Myers did not keep a set of regular books and records for his used car business during any of the years involved. He had no records for the years 1942 to 1947, inclusive, of his livestock trade, his produce business or other enterprises, except the used car business. The accountant, after 1942, received from Myers' real estate agent a statement of interest collected on notes, total return and profits or losses on real estate sales. In 1942, the accountant employed by Myers determined a net income of *143 $32,799.67. Myers stated that he did not believe that his profit was that large and after adjustments the profit was reduced to $10,237.41 and this amount was reported in the 1942 joint return. The adjustments made were for undeposited cash on hand, inventory of automobiles and trucks and another adjustment of $2,562.26. In March 1943, the accountant, then preparing the 1942 joint return, advised Myers that he should keep a regular set of accounting books and records and this advice was repeated at later intervals. The records kept of the used car business were used for determining gross profits for some of the years in question but in other years bank statements of deposits and disbursements were employed. The cash operating expenses reported were orally supplied by Myers and other operating expenses determined from canceled checks pursuant to explanations by Myers. The accountant was unable to tie in the used car records with Myers' deposits to his bank during any of the years 1942 to 1947, inclusive. The accountant did not know whether he had reported all the used car sales which Myers had made. During the course of the investigation of the petitioners' returns, Myers cooperated *144 with the examining agent. An estimate of Myers' income for the years 1933 to 1941, inclusive, which was made by Myers and his accountant, reveals the following: Year
Income
1933
$6,000
1934
4,000
1935
7,500
1936
5,000
1937
3,500
1938
4,000
1939
5,000
1940
7,500
1941
5,000 The petitioners' income, as reported and as determined by the respondent for the years in question, is as follows: Clyde W. Myers
Reported
Determined
Unreported
Year
Net Income
Net Income
Net Income
1939 $
$21,313.67
$21,313.67
1940
3,372.95
3,372.95
1943 *
13,727.10
14,389.61
662.51
1944
7,326.81
30,870.29
25,543.48
1945
14,815.13
35,025.19
20,210.06
1946
24,572.26
71,070.76
46,498.50
1947
58,981.13
66,127.90
7,146.77
Year
Reported
Determined
Unreported
1943
$14,077.34
$14,739.85
$ 662.51
Clyde W. Myers and
Posey W. Myers
Reported
Determined
Unreported
Year
Net Income
Net Income
Net Income
1941
$ 4,843.54
$32,891.25
$28,047.71
1942
11,074.77
23,317.43
12,242.66
The net income reported by Posey for the years 1943 to 1947, *145 inclusive, and the tax paid thereon, are as follows: Net Income
Year
Reported
Tax Paid
1943
$2,751.64
$597.38
1944
3,680.64
755.16
1945
753.27
58.25
1946
3,784.33
648.42
1947
2,751.65
432.59
Myers' failure to file income tax returns for the years 1939 and 1940 was due to fraud with intent to evade tax and not due to reasonable cause. The deficiencies in tax were due to fraud with intent to evade taxes. Opinion VAN FOSSAN, Judge: The respondent determined that petitioners' failure to file income tax returns for the years 1939 and 1940 and the deficiencies in tax for all succeeding years, including 1947, were due to fraud with intent to evade tax. On this issue, respondent has the burden of proof and the evidence of fraud must be clear and convincing. It has often been said that proof of fraud by pointing to one specific instance or thing is seldom possible, - that it is usually to be found in a course of conduct irreconcilable with honesty of purpose and purity of motive. When the evidence has been carefully assayed and tested for inferences and the entire picture is critically viewed, if there exists and persists in the mind of the Court *146 a conclusion and a conviction based on clear and convincing evidence that the taxpayer has been motivated by fraudulent intent and consciously and knowingly has undertaken to defraud the government of taxes lawfully due, then we have no alternative - we are duty bound to hold the taxpayer guilty of fraud. When the record in this case is so studied and tested and all the pieces of the mosaic are placed in juxtaposition, we find inescapable the conclusion that petitioners were guilty of fraud in their tax accounting to the government. Although handling large sums of money and despite the repeated advice of his employees and others, petitioner kept no records worthy of the name. He avers that he never even heard of the income tax law in the years preceding 1941. This we simply do not believe. Although he says he was not able to read or write, he was not dumb or stupid. He possessed a unique native sharewdness and ability to comprehend. He dealt in large sums of money and handled large transactions, including real estate, insurance, passage of title and all manner of other matters incident to a large business. In his protestations of ignorance of the existence of income tax law, petitioner *147 has overplayed his hand. In one breath he pleads illiteracy and ignorance of the existing tax law and in the next he contends that he had earned large sums of money by shrewd trading, which entailed constant association with people all conscious of the impact of federal taxes. He claimed a net worth on January 1, 1939, of some $60,000, all earned in the immediately preceding years, which earnings he never reported for taxes. We are of the opinion that petitioner throughout the period preceding 1941 when he first filed a return, consciously pursued a course of conduct of failing to file returns, although he had sufficient income to require such filing; that his failure to keep records, his avoidance of bank deposits, and methods of doing business entirely by cash were part and parcel of a plan to evade tax; that in the succeeding years when he filed returns, he deliberately withheld large sums of income from such returns. From these and other facts of record, we conclude that petitioner in the years 1939 and 1940 fraudulently failed to file returns and that for all the later years when returns were filed, such returns fraudulently understated his income. Respondent correctly determined *148 that fraud was present throughout the years here under study. With the determination that petitioner was guilty of fraud throughout the taxable years, the question of the statute of limitations becomes moot. Turning to the remaining question, it is conceded by the taxpayers that the determination of income by respondent by the net worth method is justified in the instant case due to the failure of the taxpayers to keep proper records. The schedule of assets and liabilities employed in the determination of the increase in the net worth of the petitioners is agreed upon except for cash on hand, living expenses, inventory and the inclusion of a certain bank account in Myers' net worth. The petitioners contend that Myers' net worth on January 1, 1939, was between $55,000 and $65,000 and that he possessed cash on hand as of that date in the amount of $38,000. This contention is not supported by the record. His own testimony is to the effect that he might have had $100 or $200 or possibly $5,000 at the beginning of 1939. His business ventures up to 1939 had usually been entered into in conjunction with others and had not proved particularly profitable. Myers first began to make money *149 in 1934. His income for the years 1933 through 1938, as estimated by Myers and his accountant, reveals a total income of $30,000, including income of $6,000 in 1933. Giving effect to Myers' testimony that he first began to make money in 1934 and estimating his living expenses for the five years 1934 through 1938 at $2,000 per year, we find that a possible net worth not to exceed $5,900, as of the close of 1938 and as determined by the respondent, is indicated. This is in complete contradiction to Myers' fantastic claim that his net worth was approximately $60,000 at this date and coincides with the respondent's calculation of his net worth at $5,900. A further discrediting factor against Myers' claim is that he filed no income tax return prior to 1941, yet claims a net worth of $60,000 at the close of 1938 accumulated from his businesses. No record of any kind or any credible evidence supports his contention that Myers had cash on hand of $38,000 and an inventory of $18,000 as of the beginning of 1939. On the basis of his testimony as to his business activities and his method of conducting his business prior to 1939, this claim appears to be wholly without foundation. Calling into *150 use all of our long experience in judging credibility, we are utterly unable to put the stamp of approval on much of the evidence presented to support Myers' claim as to cash on hand. We determine that Myers' net worth as of January 1, 1939 was $5,900, as determined by respondent. Included within Myers' assets for purposes of net worth computation for the years 1943 through 1947 is the bank account in Posey's name which was opened in 1943 and used by Posey to deposit the rental income derived from properties purchased by Myers. The proceeds from the sale of these real estate properties were received by Myers but reported by Posey in her returns. The evidence does not reveal how much, if any, of this real estate was transferred to Posey, and, in the light of Myers' testimony that he undertook to control any investments he made, it is not established that the amounts deposited in this account should be excluded from his net worth determination. The petitioners also dispute the respondent's net worth determination that Myers had cash on hand as of the close of 1947 in the amount of $13,000. The record establishes that Myers' business activities, used car sales, investments and certified *151 check activity greatly increased during the years from 1942 through 1947 and that during these years Myers made most of the money earned during the period before us. The petitioners have introduced no evidence satisfactorily rebutting the determination and we cannot hold that the respondent erred in this regard. The respondent determined the petitioners' living expenses from canceled checks and from other sources such as the weekly allowance granted to Posey, life insurance premiums, purchases of furniture and other household items, expenditures for ponies and their upkeep and the use of automobiles. It appears from the evidence presented that canceled checks for the year 1943 in the amount of $1,436.80, $2,909.50 for 1944, and $1,200 for 1945 should not have been included therein. The petitioners' living expenses for the years 1939 to 1942, inclusive, were based upon an estimate by Myers after discussions with respondent's agent and Myers' accountant. In view of all the evidence, we approve the living expenses of the petitioners for the several years as fixed by them and as set out in our findings of fact. Except as to the above corrections, the deficiencies determined by respondent *152 on the net worth basis are approved. The failure to file returns for the years 1939 and 1940 was not due to reasonable cause and the deficiencies in tax in the returns filed for all the taxable years were due to fraud with intent to evade tax. Decisions will be entered under Rule 50. Footnotes
*. Victory Tax↩